Mearle Ernest WYATT, Plaintiff in Error,

v.

The STATE of Oklahoma, Defend-
ant in Error.

No. A–13668.

Court of Criminal Appeals of Oklahoma.

Jan. 12, 1966.

Lon Kile, Hugo, for plaintiff in error.

Charles Nesbitt, Atty. Gen., Hugh H. Collum, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

The plaintiff in error, Mearle Ernest Wyatt, hereinafter referred to as the defendant, was charged in the district court of McCurtain County with the crime of manslaughter in the first degree. He was tried before a jury, convicted of manslaughter in the second degree, sentenced to serve two years in the state penitentiary, and has appealed.

The information herein charges, in substance, the following:

"* * * Mearle Ernest Wyatt did in McCurtain County, and in the State of Oklahoma, * * * commit the crime of manslaughter in the first degree in the manner and form as follows, to-wit:

"That is to say the said Mearle Ernest Wyatt, in the county and state aforesaid, and on or about the 19th day of August, 1961, then and there being, did then and there unlawfully, wilfully and feloniously, without authority of law, without a design to effect the death of any person, but while he, the said Mearle Ernest Wyatt, was engaged in the commission of a misdemeanor, to-wit:

"That is to say the said Mearle Ernest Wyatt did then and there wilfully, unlawfully, wrongfully, recklessly and maliciously drive a certain 1952 Chevrolet automobile on and along a country road in McCurtain County, Oklahoma, from a point unknown on said county road to a point approximately two miles north of Vallient, McCurtain County, Oklahoma, in a reckless manner and without due regard for the safety of the passengers in said automobile, or for other persons who might be traveling upon said highway, in that the said Mearle Ernest Wyatt, while operating said motor vehicle as aforesaid, drove said vehicle to the left of the center of said highway without due regard to oncoming traffic so as to constitute an immediate hazard, to-wit: That the said Mearle Ernest Wyatt collided his car with a 1960 Rambler driven by one Frances Miller, then and thereby causing the death of Patty Joe Gross, a passenger in the automobile driven and operated by him, the said Mearle Ernest Wyatt, contrary, etc."

It becomes necessary to make a short statement of the facts and the testimony introduced:

The trial took place on July 8, 1964, some three years after the collision occurred from which this case arose. The collision was on August 19, 1961 at about 7:15 P. M., at "dusky dark", on the crest of a hill, on a blacktop country road. The road did not have a painted center line, since it had been recently resurfaced. There was to be a rodeo at Vallient, Oklahoma, where all the parties involved resided, the

night this accident occurred. All of said parties had planned to attend the rodeo.

Homer Gross, the father of the deceased boy Patty Joe Gross, was the first witness for the State. He testified that the defendant came to his home between six and seven o'clock on the afternoon of August 19, 1961; that he sat in his car some ten or twelve minutes, and after several invitations he got out of his car and sat on the porch for about fifteen minutes. When defendant left, Patty Joe Gross and another boy, Leonard Hyland, who had been at the Gross home most of the day, left with him. Mr. Gross did not see his son again until about 11 o'clock that night, at Idabel, in the funeral home. He was dead.

Wanda Smith testified that she met Mrs. Frances Lucille Miller at the home of Mrs. Miller's mother-in-law, about five or six o'clock in the afternoon. They got into Mrs. Miller's 1960 Rambler automobile, with her three children, drove down by the rodeo grounds and picked up Anna Marie Clark, a cousin of Mrs. Miller. They drove around town, and then travelled north about three miles, turned and started back to Vallient. Wanda Smith said that as they topped a hill, she saw the defendant's car coming toward them, on their side of the road. She stated that Mrs. Miller turned to the left, and the cars collided. She did not know who was in the other car. She remained unconscious until after she reached the hospital in Idabel.

Wanda Smith, Mrs. Miller and Mrs. Clark were in the front seat of the Rambler. Wanda Smith was holding Mrs. Miller's seven-months old baby, and Mrs. Clark had a four-year old child in her lap. A twenty-months old child was in the back seat.

Mrs. Miller testified about the same as did Wanda Smith concerning the arrangement in the car, and where they went. She then testified further that after she turned around and started back to town: "Well, I came up over this hill and this car was coming right at me, on my side of the road, so much on my side of the road that I couldn't have possibly missed him; and I got on my brakes first thing and I went to my left," in an effort to miss the other car. She stated that she did not recall the impact. She was rendered unconscious, but regained consciousness while she was still in the car. She later learned that two of her children and Mrs. Clark had been killed. Nothing was asked her about the occupants of the other car.

Hubert Hibbin, a member of the Oklahoma Highway Patrol, testified that he was called to this accident, which occurred at approximately 7:15 P.M., and that he reached the scene about 8 o'clock. He stated that a 1952 Chevrolet and a 1960 Rambler had crashed head-on, approximately in the center of the highway, a little to the left of the center, when viewed from defendant's direction of travel. The defendant was still in the Chevrolet under the steering wheel, "more or less slumped over"; that there was no one else in the car; and said, "I believe he [referring to the boy Patty Joe Gross] had already been removed." He stated further that Mrs. Miller was being removed from her car to the ambulance when he arrived, and there were two of the little Miller girls lying there, both dead. That one ambulance had already left the scene when he arrived. That the Rambler left about 40 feet of tire marks, starting out straight on the right of the center, and the party then veered to the left, "as if going to the other side of the road to evade something, or the other vehicle." He testified that the highway was 22 feet wide at the point of the collision, and did not have a center line, and that the impact occurred practically in the center of the road. He estimated the speed of the cars at "approximately 50 miles per hour each". He was asked:

"Q Mr. Hibben, did you later go down to the hospital? A Yes, sir.

Q And did, or what did you find there in regard to the persons in that automobile accident? A I found Mr. Wyatt, Mrs. Miller, Phyllis Mil-

ler, Wanda Smith, Leonard Wright, and I believe that was all five in the hospital, and the rest were at the funeral home.

Q And who were at the funeral home? A Leonard Hyland, Patty Joe Gross, Fern Marie Miller and Deborah Gail Miller and Anna Marie Clark.

Q In regard to Patty Joe Gross, was she dead at the time she was brought to the funeral home? ["She" refers to the boy named Patty Joe Gross]. A Yes.

Billy Ray Haynes, who was 17 years of age at the time of the trial (and therefore 14 years old at the time of the accident), testified that he got into defendant's car, and they drove around town for awhile; then they started out to the "Hilltop", a beer tavern, but did not stop there. They circled the "Hilltop" and drove north. That he "and this McClure boy" got out of the car and did not get back in. He said they saw the cars as they ran together. He testified that at the time he got out of the car, Leonard Wright, Lennie Hyland and Patty Joe Gross remained in the car with the defendant, who was driving. That defendant was driving on the left side of the road, and just as he got to the top of the hill, he was pulling to his side of the road and continued, "but he was still more on the left side of the road than on his side of the road". That after he and the McClure boy saw the collision, they went and looked in the cars. Then they ran back to the "Hilltop", and called the ambulance and the highway patrol. When asked what he saw when he got up to the cars, he answered: "I seen a bunch of people in there and babies. It scared me and I turned around and run."

Mr. Ronald Gene Austerdot testified for the defendant, that he reached the collision after it had happened, and before the highway patrol arrived. His testimony was that the tire marks were on defendant's side of the roadway; and that the impact of the cars had jarred them apart. No mention was made of anything other than the roadway, position of the cars, etc.

Mr. Harry L. Rimmer, county surveyor, testified as to the condition, grade, width, etc., of the road, and the absence of the line painted, as a center line.

The defendant, a welder by trade, was at the time of the trial living in Long Beach, California. He testified that he had not been drinking on the day of this accident; that he saw Mrs. Miller coming; that she was coming right at him, that he was driving with his left wheels more to the center of the narrow road; that he was travelling north and Mrs. Miller was going south; that she was driving to the left of her side of the road; and he stated that when he saw that the collision was imminent, "all I could do was pull to the right". That he was rendered unconscious when the wreck occurred, and remained unconscious for two days, and that he was in the hospital six weeks. He stated that he had not been drinking when he went to the home of Mr. Gross.

Defendant offers three propositions for the Court's consideration, as the basis for his appeal. We find it unnecessary to discuss his second proposition; and we choose to discuss first defendant's third proposition, after which we will discuss the one more vital, shown as defendant's first proposition.

Defendant's third proposition is:

"A court cannot refuse a continuance properly requested, where the ends of justice clearly require it to be granted."

This case was assigned for trial for July 7, 1964. On that date the defendant filed an "affidavit and motion for continuance," setting forth therein that O. A. Brewer, "his chief Oklahoma attorney" was ill, and that he did not have this information until 1:15 in the afternoon of July 6; and for the further reason that on July 4, 1964 his principal witness, Leonard Reich, accidentally lost his life by drowning. The motion recites that the affidavit of the physician concerning Mr.

Brewer's illness is attached thereto, but the reporter failed to copy this exhibit.

This motion was presented to the trial court on July 8, 1964, overruled, and the case proceeded to trial on that date.

The record before us indicates that at the time of this accident the defendant and his father were doing some work (presumably on the farm or ranch) for attorney J. P. Harvell, of Paris, Texas, and Mr. Harvell participated as one of defendant's attorneys. This attorney had never been admitted to practice law in Oklahoma, so he brought Mr. Flannary, an attorney in his office who had been admitted to practice law in Oklahoma, to represent this defendant at his preliminary hearing. The date of the preliminary is not shown, but the complaint is dated August 22, 1961.

Mr. Harvell testified that he discussed with the county attorney the engagement of an Oklahoma attorney to represent the defendant, and arrangements were made with Mr. Brewer, who had been in the case "since soon after the accident happened, for something like three years."

The record shows that Mr. Brewer and Mr. Harvell filed a motion to set aside the information on January 19, 1962, and a demurrer on April 4, 1962; and Mr. Harvell testified that he expected Mr. Brewer to have charge of the case for the defendant. When he learned of the illness of Mr. Brewer, he got in touch with Mr. Flannary, who came to Oklahoma on short notice and handled the defendant's case.

In connection with Mr. Flannary's practice in Oklahoma, the court made the following statement: " * * * In that connection the court takes consciousness of the fact that Mr. Flannary has not appeared in court in this district for the past seventeen years."

■ It is common knowledge, and especially among the members of the Oklahoma bar, that Mr. O. A. Brewer suffered a stroke on July 6, 1964, from which he did not recover.

■ In Teter v. State, 7 Okl.Cr. 165, 122 P. 1115, this Court said:

"This court is of the opinion that forcing the defendant to trial under the circumstances, was error. * * *

"While an application for continuance on account of the sickness of an attorney is addressed to the sound discretion of the trial court, we think that in this case the continuance should have been granted, at least for a few days, if not for the term, by reason thereof; and we are clearly of opinion that the court erred in refusing to grant a new trial, under the circumstances of this case, for this reason alone."

There is a long line of cases holding that applications for continuances are addressed to the discretion of the trial court, and that its decision will not be disturbed on appeal unless it appears that there has been an abuse of such discretion, and absence of counsel is not made one of the grounds for a continuance. If, however, the trial court's decision in overruling an application for continuance resulted in depriving a defendant of proper counsel, a new trial will be granted. Gilroy v. State, 64 Okl.Cr. 332, 80 P.2d 602.

■ Under the showing made in the case at bar, it is our opinion that the defendant should have been granted a continuance, and that the failure of the court to do so was sufficient error to deprive defendant of proper counsel.

■■ Defendant's first, and more vital proposition of defense, is:

"In a prosecution for homicide the burden rests upon the state of proving the corpus delicti beyond a reasonable doubt. In prosecution for homicide the corpus delicti consists of two fundamental and necessary facts: first, the death; second, the criminal agency of another as the cause."

Counsel for defendant contends:

"There is no positive proof that Patty Joe Gross was in the Wyatt boy's car

at the time of the collision; and most certainly there is no evidence of any kind that if he was in the car at the time of the collision that he received any injuries in the accident; and certainly there is no proof that his death was the result of any injuries sustained in the accident."

In support of this contention, defendant quotes from the case of Edwards v. State, 58 Okl.Cr. 15, 48 P.2d 1087, wherein this Court held:

"In every criminal prosecution the burden rests upon the state of proving the corpus delicti beyond a reasonable doubt. In prosecution for homicide the corpus delicti consists of two fundamental and necessary facts: First, the death; second, the criminal agency of another as the cause; as applicable to this case, it was necessary to show, first, that the deceased died from the effects of a wound, and, second, that the wound was unlawfully inflicted by the defendant."

Defendant further cites Title 21 O.S.A. § 693, which provides:

"No person can be convicted of murder or manslaughter, or of aiding suicide, unless *the death of the person alleged* to have been killed and *the fact of the killing by the accused* are each established as independent facts beyond a reasonable doubt." (Emphasis supplied.)

In the case at bar, not one witness testified that he saw the deceased at the scene of the accident. The only testimony indicating the death of Patty Joe Gross was the statement of the highway patrolman in answer to the question: "And who were at the funeral home?" The patrolman answered, "Leonard Hyland, Patty Joe Gross, Fern Marie Miller and Deborah Gail Miller, and Anna Marie Clark." He was asked next, "In regard to Patty Joe Gross, was he dead at the time he was brought to the funeral home?" His answer was, "Yes".

The young Haynes boy testified that when he got out of the defendant's car the defendant was driving, and the deceased was in the car. Absolutely no proof was offered that he received any injuries as a result of the collision. The first time the highway patrolman saw the Gross boy, the boy's body was in the funeral home. The patrolman was not at the scene of the accident when the ambulance arrived. There is no testimony by the undertaker, a doctor, or anyone else concerning the injuries to or the death of Patty Joe Gross.

The corpus delicti need not, of course, be shown by direct testimony; it may be determined from the circumstances of the case; but in view of the fact that the burden of proof rests upon the state, such circumstances must appear from the evidence. In the case at bar, there is no such direct testimony. If in fact the defendant's negligence was the proximate cause of the collision, and the death of Patty Joe Gross, it must be gathered from the circumstances shown. The Highway Patrolman testified that in his opinion both cars were travelling at about 50 miles an hour, which was under the legal speed limit. It was, therefore, not the speed of either party which was the proximate cause of the accident, but instead, it must have been the position of one car, or the other, or both cars, which was or were over the center of the road. Which car might have been in the wrong is not clearly shown by the record before this Court.

After a careful consideration of all of the testimony introduced by the State, and the evidence of the defendant, it is the opinion of the Court that the proof of the corpus delicti in this case does not meet the requirements of law as established by the holdings of this Court. Robinson v. State, 71 Okl.Cr. 75, 108 P.2d 196.

The unfortunate and tragic results of this collision naturally tend to render more passionate human judgment in weighing the conduct of the accused; and while the jury found defendant guilty of manslaughter in the second degree, they gave him the minimum sentence therefor.

The case made recites that certain pictures of the two cars, taken the next morning after this accident, and showing the position of the cars following the accident, and maps showing the roadway, were introduced into evidence. The reporter wholly failed to include any exhibits in the case made, as provided by 12 O.S.A. §§ 956.7 and 957. If the case is retried, and these exhibits are again introduced, we assume that the reporter will not repeat this omission.

For the reasons hereinbefore stated, the case is reversed. If the State has some competent evidence to show that the death of Patty Joe Gross was the result of the carelessness, or the negligence, of the defendant, it should be shown. If it has not, the case should be dismissed, and the defendant should be discharged.

NIX, J., concurs.

BUSSEY, P. J., concurs in conclusion.